**SO ORDERED.**

**SIGNED this 09 day of March, 2009.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

IN RE:                                                   CASE NO.

RADCO PROPERTIES, INC.,                    08-03611-8-RDD

    DEBTOR

## ORDER DENYING CONFIRMATION OF CHAPTER 11
## PLAN OF REORGANIZATION AND FINAL APPROVAL
## OF THE SECOND AMENDED DISCLOSURE STATEMENT

Pending before the Court is the Amended Chapter 11 Plan and the Second Amended Disclosure Statement filed by RADCO Properties, Inc. (the "Debtor") on November 21, 2008, and any opposition thereto. A hearing was held in Wilson, North Carolina on January 12, 2009.

## BACKGROUND

Prior to the filing of the bankruptcy petition, the Debtor owned three commercial properties operated as convenience stores and sixteen residential rental properties. On May 29, 2008, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

As of the Petition Date, two of the commercial properties were leased and the Debtor was managing those properties. Approximately a year and a half ago, the Debtor closed down the third store due to concerns with respect to underground storage tanks ("UST"). Since that time, the Debtor has been unable to lease the third commercial property. In addition to the commercial properties, the Debtor owns and manages sixteen residential rental properties.

Since the Petition Date, one of the commercial tenants broke its lease and vacated the premises. Rodney Denton, president of the Debtor, testified at the confirmation hearing that only one of the commercial properties is presently occupied. That tenant is current under its lease.

Mr. Denton performs most of the maintenance and leasing in connection with the residential and commercial properties. The Court approved Debtor's employment of Mr. Denton on July 24, 2008. Pursuant to that Order, Mr. Denton is entitled to a monthly salary of two thousand dollars ($2,000.00) for his maintenance, management, and marketing efforts in connection with the sale of the commercial properties and the leasing of the residential rental locations.

## **PROCEDURAL HISTORY**

On July 1, 2008, New Century Bank ("NCB") filed a Motion for Relief from the Automatic Stay or In the Alternative, Motion for Adequate Protection in connection with the three commercial properties owned by the Debtor (the "Relief Motion").

On August 5, 2008, the Debtor filed its Amended Application to Employ Rick Parker and Parrish Realty, Inc. seeking Court approval to engage Mr. Parker and his firm as the listing agent for the three commercial properties owned by the Debtor. On August 11, 2008, the Court entered an Order approving the application to employ.

2

On August 27, 2008, NCB filed a Motion to Approve Consent Order with respect to the Relief Motion.  The consent order sets forth that the Debtor had not made any payments to NCB from July 2007 through August 2008 and requires that the Debtor provide NCB with proof of insurance; as well as, a monthly payment of six thousand dollars ($6,000.00) commencing on August 15, 2008 (the "Consent Order").[1]

Also on August 27, 2008, the Debtor filed its Disclosure Statement, Chapter 11 Plan, and First Amended Disclosure Statement.  On August 28, 2008, the Court entered an Order Conditionally Approving the Amended Disclosure Statement and Setting a Hearing on Confirmation of the Chapter 11 Plan.

Stephen H. Cooper, Janice M. Cooper, Richard H. Cooper, and Debra Cooper (collectively, the "Coopers") filed an Objection to Confirmation of the Chapter 11 Plan on September 19, 2008. On September 30, 2008, NCB filed its Objection to Confirmation of the Plan of Reorganization and the Amended Disclosure Statement.  On October 1, 2008, the Bankruptcy Administrator filed its Statement Regarding the Confirmation of the Chapter 11 Plan.  On that same day, Jones & Frank also filed an Objection to Confirmation of the Chapter 11 Plan.

On October 8, 2008, the Court conducted a hearing whereby the Debtor stated that it intended to file an amended Chapter 11 Plan.

On November 17, 2008, the Debtor filed a Motion to Amend the Consent Order with NCB seeking to reduce the monthly payment amount to NCB from six thousand dollars ($6,000.00) to two thousand five hundred dollars ($2,500.00) (the "Motion to Amend").   The Debtor asserted that one of the commercial tenants broke its lease and vacated the property.  Without the rental income from

---

[1]The court entered the Consent Order on October 15, 2008.

that tenant, the Debtor does not generate enough income from its other properties to maintain the six thousand dollar payment ($6,000.00) monthly payment to NCB.

On November 21, 2008, the Debtor filed its Amended Chapter 11 Plan (the "Amended Plan") and Second Amended Disclosure Statement (the "Second Disclosure Statement"). The Court conditionally approved the Second Disclosure Statement on November 26, 2008.

On November 26, 2008, NCB filed its Response to the Motion to Amend asserting that the automatic stay had already terminated pursuant to the Consent Order.

On January 7, 2009, the Court entered an order modifying the Consent Order providing that any rents received for November 2008 and December 2008 in connection with the commercial properties be paid to NCB.  The Court continued the hearing on the Motion to Amend until January 12, 2009.

NCB filed its Objection to the Amended Plan and Second Disclosure Statement on January 7, 2009.  On January 8, 2009, the Coopers filed their Objection to the Amended Plan and Second Disclosure Statement and, on January 9, 2009, the Bankruptcy Administrator's Objection to Amended Plan and Second Disclosure Statement was filed.   The Debtor, the Bankruptcy Administrator, NCB, and the Coopers were present at the hearing on January 12, 2009.

At the hearing, the Bankruptcy Administrator also objected to the Second Disclosure Statement, by oral motion, on the grounds that it fails to provide enough adequate information as required by 11 U.S.C. § 1125.

## **DISCUSSION**

The Debtor seeks confirmation of a reorganization plan that proposes alternative methods of reorganization.  The first option proposes that the Debtor will locate a capital investor or a

4

refinancing option for the commercial properties.  If that option is unsuccessful, the Debtor proposes to liquidate the commercial properties.

In order for a plan of reorganization to be confirmable, the plan must satisfy the thirteen requirements set forth in Section 1129 of the Bankruptcy Code.  The proponent of the reorganization plan bears the burden of proof as to introduction and persuasion that each of these requirements has been satisfied.  *In re Smith,* 357 B.R. 60, 66 (Bankr. M.D.N.C. 2006); *In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp*., 188 B.R. 778, 791 (Bankr. M.D.N.C. 1995); *In re Guilford Telecasters, Inc. (dba WGGT-TV),* 128 B.R. 622, 625 (Bankr. M.D.N.C. 1991).

Based upon the evidence presented at the hearing and the pleadings filed in this case, the Court finds that the Amended Plan fails to satisfy the requirements for confirmation.  Further, the Second Disclosure Statement fails to provide adequate information.

### FAILURE TO COMPLY WITH APPLICABLE PROVISIONS OF THIS TITLE

Section 1129(a)(1) provides that a court shall confirm a plan only if the plan complies with the applicable provisions of this title. 11 U.S.C. § 1129(a)(1).  The Amended Plan does not comply with Section 1101(2) of the Bankruptcy Code.

Section 11.04 of the Amended Plan states:

> The Debtor[s] may submit modifications of the Amended Plan to substantial consummation of the Amended Plan.  The Amended Plan shall be deemed to have been **substantially consummated** when the Debtor[s] [has] made the payments due under the Amended Plan for three (3) calendar months after entry of this Order of Confirmation. *Emphasis added.*

However, the Bankruptcy Code provides that substantial consummation occurs when three conditions are satisfied: (1) when all or substantially all of the property the plan proposes

5

to transfer is transferred; (2) when the debtor or its successor begin to handle the management affairs; and (3) when the debtor has commenced distributions under the plan. 11 U.S.C. § 1101(2).  In order to determine if a case has been substantially consummated, a Court must look at the specific facts of the each case.

Even though the Amended Plan satisfies the second and third requirements for substantial consummation, Section 11.04 attempts to modify when substantial consummation occurs by eliminating the first requirement.

Mr. Denton, as president, is currently operating and managing the Debtor and intends to continue doing so after confirmation.  Therefore, once those efforts begin after confirmation, the second requirement will be satisfied.

With respect to the third requirement, the Amended Plan provides that the Debtor make certain monthly payments.  More specifically, the Amended Plan requires monthly payments to Cornerstone Bank, KS Bank, and Four Oaks Bank & Trust in connection with their liens secured by the residential property.  *See Amended Plan*, *Sections 5.02-5.04*.  Cornerstone Bank is also to receive a monthly payment for its claim secured by the Debtor's truck.  *See Amended Plan, Section 5.01*.  The Amended Plan proposes to make payments towards secured claims on the residential properties and the vehicle based on the terms of the original loan documents.

As to the commercial properties, until the Debtor sells those properties, the Debtor sets forth that it will turn over any gross rents from these properties to NCB, on a monthly basis, as

adequate protection payments.[2]  NCB is to be paid monthly, assuming the Debtor receives any monthly rents in connection with the commercial properties.

Consequently, commencement of payments under the plan regardless of whether those payments are made to secured creditors, satisfies the third requirement of substantial confirmation.  However, the Debtor attempts to side step the first requirement that all or substantially all of the property proposed by the plan actually be transferred.  Section 11.04 of the Amended Plan completely ignores this requirement and provides that substantial consummation will occur once the Debtor has made payments under the Amended Plan for three months. However, the Amended Plan proposes the sale of the commercial properties.  The outside deadline for an auction sale  to be completed is July 1, 2009.  Arguably, the transfer of the commercial properties may be more than three months after confirmation of the Amended Plan.  Assuming that occurs and the Debtor has made a distribution under the Amended Plan, substantial consummation would not occur until all or substantially all of those properties are transferred.

Substantial consummation not only requires the commencement of distribution payments but also the completion or near completion of the transfer of property as set forth in the Plan.  *In re Bullion Hollow Enterprises, Inc.*, 185 B.R. 726 (W.D.Va. 1995)(citing *In re Hayball Trucking*, 67 B.R. 681, 683-84 (Bankr.E.D.Mich. 1986)).  By attempting to set a time limitation

---

[2]This Section allows for payment to be made when the Debtor receives such rental amounts from a commercial tenant.  The Consent Order provided that NCB receive monthly payments in the amount of six thousand dollars ($6,000.00).  Through its Motion to Amend, the Debtor seeks to reduce the monthly payments to Two Thousand Five Hundred Dollars ($2,500.00) based on the rental income generated from the one leased commercial property. Section 8.03 of the Amended Plan seeks to further modify the Motion to Amend and allow the Debtor to make payments in the amount received from the commercial tenant to NCB upon the Debtor's receipt of such funds. This provision contradicts not only the Consent Order but also the proposed terms set forth in the Debtor's own Motion to Amend. NCB has a secured claim in the amount of approximately $1.38 million.

for substantial consummation based solely on distributions, the requirements of substantial consummation are not met.  Accordingly, the Amended Plan attempts to modify Section 1101(2) of the Bankruptcy Code as opposed to satisfying the requirements to substantially consummate the Amended Plan.  Therefore, the Amended Plan fails to satisfy Section 1129(a)(1).

## PLAN MUST BE PROPOSED IN GOOD FAITH

Subparagraph (a)(3) of Section 1129 requires that the plan be proposed in good faith.  In order to determine if a plan has been filed in good faith, a court should consider the totality of the circumstances.  *In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp*., 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995).  In reviewing the Amended Plan and the testimony presented to the Court, the Court is unable to make a determination that the Amended Plan was, in fact, proposed in good faith.

### Leases & Executory Contracts

Article IX of the Amended Plan provides that all executory contracts and unexpired leases that have not been assumed shall be rejected.  The Debtor testified that, as of the Petition Date, two of the commercial properties were leased.[3]  Since the filing of the petition, one of the commercial tenants unexpectedly vacated the premises and broke its lease.  The Debtor failed to provide the Court with any evidence regarding the terms of either lease or the Debtor's rationale for rejecting the remaining tenant's lease.

---

[3]The commercial property in Kenly, North Carolina has not been operated in 1.5 years.  The Rocky Mount, North Carolina commercial property was vacated in November 2008 and the Wilson, North Carolina commercial property is currently leased.

8

Moreover, the Amended Plan failed to address the impact rejecting the remaining lease(s) would have on the estate; including any possible claims for the return of any security deposits or prepaid rents, or rejection damage claims.  If the Debtor, in fact, intended to reject the commercial lease, the current tenant may have the right to vacate the premises immediately, thereby, eliminating the possibility that NCB would receive any payments until the commercial properties are sold or funding is obtained.

In connection with the tenant who unexpectedly moved out, the Debtor failed to provide any information regarding the possible breach of lease action against the lessee or if the Debtor was holding any security deposits or pre-payment of rents that could offset any lost rents.

As to the residential leases, the Debtor's schedules list 16 residential addresses.  The Court is unsure as to whether or not these properties are single or multi-family residences.  Mr. Denton testified that he manages and maintains the residential properties on behalf of the Debtor and the Amended Plan proposes that the Debtor retain these properties while continuing to pay the secured creditors.

The schedules fail to provide any information regarding security deposits, the existence of any leases, or any lease terms.  Amended Schedule G only lists the three commercial property leases.  Mr. Denton testified that most of the units are occupied but that he has seen some turnover in the last few months.  The Court is left to speculate as to whether or not there are any written lease agreements, whether the Debtor is receiving market rate for the residential properties, whether the Debtor is in compliance with the laws of North Carolina for any security deposits, and if, in fact, the Debtor is holding any security deposits or prepayment monies.

Moreover, the crux of the Amended Plan relies on the income stream from the residential properties. Other than the monthly operating reports, the Debtor has failed to provide any evidence of payment or rental histories, financial projections, or projected expenses related to the residential rental properties. Should the Debtor not have any residential lease agreements, the Debtor's income stream is speculative since the tenants are month to month tenants who are not obligated to continue to reside in one of the Debtor's properties.

Similar to the situation presented by the commercial leases, the Debtor has failed to provide any evidence that, if in fact, he intends to reject the residential leases, the Debtor is not exposed to lease rejection damages, claims for prepaid rent or claims for security deposits. More troublesome for the Court is that the tenants may have the option to vacate the premises, thereby eliminating the Debtor's income stream in its entirety. Likewise, if the Debtor has not entered into residential lease agreements, the Debtor has failed to provide the Court with any evidence of its cash flow that would allow it to comply with the payment terms set forth in the Amended Plan. The Court is left with questions as to just how the Debtor intends to continue to operate.

<u>Classification of Claims</u>

Multiple classes of claims are improperly classified under the Amended Plan. For example, Class 4.03 - North Carolina Employment Security Commission ("NCESC") filed two separate claims. The first claim was based on the actual tax which the Debtor proposes to be treated as a priority unsecured claim and proposes to pay this claim over a period of sixty (60) months from the effective date of the Amended Plan.[4] The second claim filed by the NCESC

---

[4]Section 1129(a)(9)(c) requires that certain tax payments be paid over a period of sixty (60) months from the order of the relief, not from the effective date of the plan.

10

was for the penalties related to non-payment.  The Debtor proposes to subordinate the penalty claim to all other claims.  *See Amended Plan, Section 4.03.*  Regardless of how the claim is treated, the classification itself contains two dissimilar claims. The Debtor appears to be trying to classify the NCESC claims based on the holder of the claim, as opposed to distinctly classifying each claim, thereby allowing different types of claims to be included in the same class.

Furthermore, Section 4.02 sets forth the claims of the North Carolina Department of Revenue ("NCDR").  The Debtor proposes three distinct treatments for parts of this class of claims.  A portion of the claim is classified secured; a portion is classified as unsecured; and a portion classified as unsecured priority.  The Debtor appears to be attempting to classify three different types of claims into one class.  The Ballot Summary filed by the Debtor reflects Class 4.02 - NCDR accepted the Amended Plan supports this conclusion.  The claim amount listed on the Ballot Summary reflects the total amount of all three claims even though this amount should be divided between different classes.  Similar to the NCSEC claim, the Debtor appears to be attempting to classify this claim by the creditor as opposed to the type of claim.

In addition, there is an inconsistency as to whether or not the unsecured portion of the NCDR claim will be satisfied.  The Debtor proposes to pay *[a]ll* of the claims in full within sixty (60) months of the effective date of the Plan. *See Amended Plan, Section 4.02, Treatment of Claims.*  However, the Debtor presupposed that unsecured claims under Article VI will not be paid in full.  On its face, the Amended Plan seems to be proposing preferential treatment to one particular unsecured (and subordinated) creditor.  At a minimum, the proposed treatment of the unsecured portion of the NCDR claim is inconsistent.

<u>Retention of Equity Interest by Debtor</u>

Pursuant to Article VII, Section 7.01, Mr. Denton, as the sole shareholder, shall retain his stock in the Debtor in exchange for his management, labor, and services that will be provided in connection with the residential properties.  Mr. Denton's duties will also include assisting in the recapitalization or liquidation of the commercial properties.

The payment to unsecured creditors is subject to proceeds being available from the sale of the commercial properties, yet Mr. Denton as an equity holder seeks to retain his equity interest.  The Debtor asserts that Mr. Denton's services constitute new value.  The Debtor failed to provide the Court with any evidence that the value of his services are commensurate with the value of the interest he will retain in the business. Without any projections or historical information, at first blush, those services do not appear to be sufficient for the retention of a 100% equity interest**.**

### **BEST INTEREST OF CREDITORS TEST**

Section 1129(a)(7) provides that in order for a plan to be confirmable, the plan must provide creditors with at least as much as the creditors would have received in a Chapter 7 liquidation. *In re A.H. Robins, Co., Inc.,* 880 F.2d 694, 698 (4th Cir. 1989); *In re Smith,* 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006)*; In re Grandfather Mountain Limited Partnership,* 207 B.R. 475, 484 (Bankr. M.D.N.C. 1996)*; In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, 188 B.R. 778, 791 (Bankr. M.D.N.C. 1995).  This section is commonly referred to as the best interest of creditors test.  The plan proponent bears the burden of introducing evidence of its current financial situation, assets, liabilities, and prospects to satisfy the court that the proposed plan meets the test. *In re Piece Goods,* 188 B.R. at 791.

12

Under the Amended Plan, the Debtor proposes to maintain the residential properties and remain current on debts securing those properties.  Section 7.01 of the Amended Plan provides Mr. Denton will retain all of his stock in exchange for continuing to provide services to the Debtor.

However, the Court is unable to make an accurate determination of the value of residential properties.  No evidence of valuation of the residential properties was presented at the hearing.

Based on the Debtor's operating reports, the Debtor has been making payments to certain creditors who hold liens on the residential properties.  The Debtor values the residential properties in two groups on its schedules.  The first group consists of five properties in Wilson County with a combined value of Seventy-Five Thousand Dollars ($75,000.00).  Cornerstone Bank has a lien against these properties in the amount of Fifty Eight Thousand Dollars ($58,000.00).[5]   Section 4.04 of the Amended Plan provides to the extent there is a lien on these residential properties, the Wilson County Tax Collector will be paid through five (5) annual installments commencing on July 1, 2009.  The Amended Plan does not provide for the amount of the claim but the schedules list a secured lien in favor of the Wilson County Tax Collector in the amount of Two Thousand Five Hundred Dollars ($2,500.00).

---

[5]Cornerstone Bank also holds a security interest in a 2004 F150 Ford pickup truck. The Schedules list the debt due to Cornerstone is Six Thousand Dollars ($6,000.00). Therefore, based on the Schedules, the total amount owed to Cornerstone Bank is approximately Sixty Four Thousand Dollars ($64,000.00).

13

The Amended Plan values these same five properties at Sixty Thousand Dollars ($60,000.00), Fifteen Thousand Dollars ($15,000.00) less that the amount set forth in the schedules.  Mr. Denton stated that he had recently completed some repair work on the residential properties but his testimony was not specific as to which properties were repaired.

Part of Mr. Denton's responsibilities are to maintain and manage the residential properties and based on the amounts in the Amended Plan, these five properties lost a combined value of approximately twenty percent (20%) between the time the case was filed and the filing of the Amended Plan.  The Debtor does not substantiate the basis of its valuation or its reason for such a significant decrease in value.

The Debtor also proposes to retain the eleven additional residential properties located in Wilson County.  KS Bank holds a first lien and Four Oaks Bank & Trust Company holds a second lien with respect to those properties.   The scheduled value of these properties is One Hundred Four Thousand Dollars ($104,000.00); yet, the Debtor's Amended Plan lists the combined value of these properties as Ninety Four Thousand Dollars ($94,000.00).

 KS Bank holds a lien in the amount of Seventy One Thousand Dollars ($71,000.00) and Four Oaks Bank & Trust Company holds a second lien for Eighteen Thousand Dollars ($18,000.00).  Wilson County also holds a secured lien for unpaid taxes in the amount of One Thousand Eight Hundred Dollars ($1,800.00).

The Debtor's operating reports reflect that Six Thousand Four Hundred Seventy Seven Dollars and Seventy Eight Cents ($6,477.78) has been paid to KS Bank.  The operating reports show that no payments have been made to Four Oaks Bank & Trust Company.[6]

Brown Oil Company holds a judgment lien against the Debtor based on a lawsuit in Wilson County.  Consequently, its lien extends to both the residential and commercial properties located in Wilson County.  Pursuant to Section 8.06, the Amended Plan seeks to avoid any judgment or judicial liens held against the residential properties.  The Amended Plan offers no explanation as to why this lien should not attach to any equity that the Debtor may have in any property located in Wilson County, including the residential property.

The Debtor bears the burden of producing and persuading the Court that a plan is in the best interest of creditors.  The Debtor failed to provide the Court with any explanation as to fair market values or why the values used in the Amended Plan are significantly lower than the amounts listed in the Debtor's schedules.[7]  Instead, the Debtor reduces the values listed in the schedules and summarily states there is no equity in the residential properties.  If, in fact, there is equity in the residential properties,[8] Brown Oil Company's treatment as set forth in the Amended Plan, and quite possibly other creditors, would receive less than they would have under a liquidation.

---

[6]The Amended Plan asserts that the claim of Four Oaks Bank & Trust Company is not impaired.  However, the Debtor does not provide any proposals to cure pre-petition or post-petition defaults. No testimony was offered as to the payment terms of this loan and whether the Debtor is, in fact, delinquent on its post-petition payments. *See Amended Plan, Section 5.04.*

[7]The liquidation analysis set forth in the Amended Plan provides for a six percent (6%) reduction for costs related to liquidation from the lower values set forth above.

[8]The Debtor failed to provide any information in connection with the monthly rental income generated by the residential properties. Therefore, the Court is unable to make a determination as to the value of the properties as a going concern.

With respect to the commercial properties, the Amended Plan proposes to locate a capital investment, refinance the NCB loan, or sell the properties.  The Amended Plan provides that if the Debtor shall fail to satisfy one of these three conditions by February 28, 2009, then on or before March 31, 2009, the Debtor agrees to commence public auction proceedings.[9]  *See Amended Plan, Section 8.03.*  The Amended Plan provides that the sales shall be completed by July 1, 2009 and that the Debtor retain no less than ten percent (10%) of the gross sales price for sale expenses, income taxes, and administrative expenses.

The Amended Plan fails to provide any additional information with respect to the auction sales, except that the Debtor and NCB shall agree upon the terms.  The Amended Plan lacks any sales projections, cost details, credit bid procedures, credit bid fees, or the Debtor's specific basis for the ten percent (10%) holdback.

The Court is left to speculate as to the costs of the proposed auction sale. Based on other auction sales presented to this Court in other cases, typically, there is a fee involved with auctioneer services, even if a secured creditor credit bids.  Consequently, NCB may receive less than it would if the property was liquidated under a Chapter 7.  At a minimum, based on the ten (10%) holdback provision, NCB would be exposed to additional fees equal to ten percent (10%) of its credit bid.  Whereas, in a Chapter 7, NCB would retain the full value of its lien without incurring the costs to credit bid and purchase its collateral back or a Chapter 7 Trustee would surrender the collateral to NCB based on the Trustee's determination that there is no equity in

---

[9]It is unclear from the Amended Plan as to whether the Debtor intends to conduct one auction for all three properties or three separate sales.  For the purposes of this Order, the Court will assume that the Debtor proposes to have three separate sales based on the language in Section 8.03 of the Amended Plan.

the property.  Regardless, in a Chapter 7, NCB would not be subjected to costs in order for it to

take back its collateral.

In addition to the auction costs, NCB faces additional exposure on account of the

Debtor's apparent rejection of the remaining commercial lease.  The Amended Plan ties the

amount of the payment to NCB to the rental stream received from the commercial tenant(s).  At

the present time, that amount is Two Thousand Five Hundred Dollars ($2,500.00).   Based on the

fact that the Amended Plan rejected the remaining commercial lease, it is foreseeable that the

tenant may vacate the premises and the Debtor may not receive any rental income in the near

future.  The Amended Plan does not require the auction sales to be completed until July 1, 2009.

Accordingly, the six month delay in payment to NCB would increase the amount owed to NCB,

thereby, resulting in NCB receiving less than it would have received had there been an

immediate liquidation under Chapter 7.

Lastly, the three commercial properties are currently being marketed for a cumulative

sales price of $1.75 million[10] with a ten percent (10%) commission to the broker.  The Debtor

failed to inform the Court as to whether or not auctioning the properties will subject the Debtor

to any costs related to the termination of the real estate listing agreements and how these costs

---

[10]Schedule D filed by the Debtor reflects that the commercial properties are valued collectively at One
Million Five Hundred Twenty Two Thousand Dollars ($1,522,000.00).  Assuming the properties bring this amount
at auction, after the ten percent (10%) administrative fee, the net proceeds are One Million Three Hundred Sixty
Nine Thousand Eight Hundred ($1,369,800.00).  Based on the Relief Motion, as of June 30, 2008, the amount due to
NCB is approximately One Million Three Hundred Eighty Three Thousand Three Hundred Ten Dollars and Sixty
Four Cents ($1,383.310.64) with a per diem charge of Two Hundred Thirty Six Dollars and Sixty Eight Cents
($236.68).  Accordingly, based on the Debtor's schedules, NCB would be entitled to all of the proceeds received by
the Debtor if the properties were liquidated.  Delaying the liquidation only further impairs and increases NCB's
claim.

would be paid. Again, the Court is left to conjecture as to the impact of the listing agreement on other creditors.

Therefore, based on the lack of evidence and the ambiguities regarding the costs involved with the proposed auction sales, the Court finds that NCB would likely receive less under the Amended Plan than it would in a liquidation in a Chapter 7. Accordingly, the Amended Plan fails to meet the requirements set forth in Section 1129(a)(7).

## FEASIBILITY OF THE AMENDED PLAN

Section 1129(a)(11) of the Bankruptcy Code requires that in order for a plan to be confirmable, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This requirement is often called the feasibility requirement. *In re A.H. Robins, Co., Inc.,* 880 F.2d 694, 698 (4th Cir. 1989)**.** The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence. *In re Investment Co. of Southwest, Inc. (F.H. Partners, L.P. v. Investment Co. of Southwest, Inc., Four Hills Associates, and Bank of America),* 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006). Feasibility is "firmly rooted in predictions based on objective fact." *In re Cheatham,* 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987); *In re Investment*, 341 B.R. at 310.

*In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp*., the Bankruptcy Court for the Middle District of North Carolina set forth factors a court may consider in assessing feasibility. 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995). These factors include "the capital structure of the reorganized [d]ebtors, their projected earning power, economic conditions,

18

management's ability and likelihood of continuing to work for the reorganized [d]ebtors, and any other factors relevant to the performance of the [p]lan." *Id.* (citing *In re Polytherm Industries, Inc.,* 33 Bankr. 823 (W.D. Wis. 1983)).

Based on these and other factors, the Court finds that the Amended Plan is not feasible. Since the filing of this case, the Debtor has had difficulty satisfying its financial obligations. The Debtor has failed to remain current with the post-petition adequate protection payments to NCB. The Amended Plan proposes to limit the amount of the adequate protection payments to the rents received in connection with the commercial properties when the Debtor has not even been able to remain current with other approved expenses. Mr. Denton testified that he has not taken the allowed officer salary at times during the past few months based on unexpected costs and expenses. Consequently, the residential rental properties do not appear to be generating enough income to satisfy the projected expenses.

The Court has concerns in connection with the residential rental properties. As previously addressed, if any residential leases exist, the Amended Plan rejects them. If the Debtor chose to assume such leases, the Debtor has failed to provide any financial information related to the number of units rented, the number of units available, the monthly rental amounts, the lease/occupancy terms, and whether the Debtor has any security deposits being held on behalf of the tenants. Furthermore, the Debtor has failed to provide any projections or rent rolls as to the profitability of the residential rental properties that it intends to retain.

With respect to the commercial properties, Mr. Denton testified that he had a potential investor that expressed some interest in a joint venture. Mr. Denton stated that the potential investor discussed infusing $5 million dollars into RADCO, Inc. However, the investor would

not have the funds available until he was able to sell a coal mine he owned in another state.

Mr. Denton stated that based upon his belief, the investor was represented by counsel and the

investor was definitely interested.  He testified that the investor had not done any due diligence

or requested any financial documentation.  The Debtor failed to provide the Court with any

specific information about the potential investor beyond his name.  Joe Rogerson was not

presented as a witness and there was no written evidence presented to the Court to verify Mr.

Rogerson's interest.  In addition, Mr. Parker, the listing agent from Parrish Realty, did not testify

on behalf of the Debtor's Amended Plan.  Consequently, without any evidence, the Debtor has

not satisfied his burden of persuasion.

The commercial properties have been on the market for more than five (5) months.  Mr.

Denton testified that there has been a little interest but nothing significant.  In addition, two

properties are now vacant, including one property that has environmental concerns.  As to the

third property, a question still exists as to whether or not this property would be vacated upon

confirmation based on the Debtor's rejection of the lease.  To expect an investor to step into such

a situation without any feasibility studies or documentation is speculative at best, especially in

this volatile economy and market.  Consequently, based on the fact that the Debtor failed to

provide the Court with any evidence of viable investment opportunity, the Court finds that the

Amended Plan is not feasible.

The Amended Plan, however, does provide a drop-dead provision.  In the event that the

Debtor is unable to find an investor or to refinance the commercial properties, the Debtor will

auction the properties no later than July 1, 2009.  A debtor is not automatically able to establish

feasibility by merely including a drop-dead clause in its plan.  *In re Investment Co. of Southwest,*

*Inc.* (*F.H. Partners, L.P. v. Investment Co. of Southwest, Inc., Four Hills Associates, and Bank of America*), 341 B.R. 298, 317 (B.A.P. 10th Cir. 2006). Even though a creditor is permitted to take back and liquidate its property if a debtor is unable to meet a certain contingency, this option does not automatically support a finding of feasibility. *Id.*

The Debtor in *In re Investment Company of Southwest, Inc.* proposed to sell certain properties and pay the secured creditor a specific release price. *Id.* If after a specified period of time the Debtor had not liquidated the properties, the drop-dead provision would permit the creditor to foreclose. *Id.* The court determined that there were too many unknown factors in the event of default as to whether the secured creditor in all circumstances would be made whole through the foreclosure process and therefore, the inclusion of the drop dead clause did not ensure feasibility. *Id.*

Similar to *Investment*, the drop-dead clause in the Amended Plan does not ensure feasibility. In this particular case, the Debtor is proposing to liquidate only some of its properties, the non-performing commercial properties. During the period between confirmation and the sale of the commercial properties, the Debtor proposes to turn over rents, if any, to NCB. NCB's claim will continue to increase while the Debtor remains in possession based on the Debtor's inability to make adequate protection payments equivalent to the interest accruing.

In contrast to the proposal in *Investment* where the creditor receives the property back to foreclose, the drop-dead provision in the Amended Plan does not allow NCB to retake its collateral. Instead, the Debtor requests that the Court provide the Debtor approximately five and a half months to negotiate the terms of an auction(s) sale and to conduct such sale(s). The Debtor also requests that from the proceeds of the auction sale(s) that ten percent (10%) of such

21

proceeds be earmarked for the Debtor's administrative expenses.[11]  The ten percent (10%) holdback lessens the amount to be received by NCB should the sale(s) not generate sufficient funds to satisfy the NCB lien.  In addition, the Amended Plan does not address any potential adverse effects that may result from the termination of the listing agreement.  The plan in *Investment* proposed that the property be returned to the secured creditor.  *In re Investment*, 341 B.R. 298.   In contrast, NCB not only bears the burden of the delayed auction process and the risk of the ongoing market decline, but because of the holdback percentage, NCB also bears the burden of funding a portion of the expenses incurred by the Debtor as a result of the bankruptcy filing.

A recent decision by Judge Small in the Eastern District of North Carolina addressed the feasibility of a plan that included a drop dead clause. *In re Price Funeral Home, Inc., Case No. 08-04816-8-ATS (A. Thomas Small, Judge)(December 12, 2008).*  In *Price*, the secured creditor, Royal Bank of Canada ("RBC"), objected to the debtor's plan and disclosure statement on the grounds that the disclosure statement failed to provide adequate information and the plan of reorganization was not feasible.  *Id.*  RBC filed a proof of claim in the amount of One Hundred Eighty Three Thousand Eight Hundred Sixty-Nine Dollars and Thirty One Cents ($183,869.31) plus Eighty Five Dollars and Seventy Three Cents ($85.73) calculated per diem.  *Id.*  Price Funeral Homes, Inc. had previously filed a Chapter 11 plan which was substantially consummated with the final decree being entered on March 24, 2003.  As part of the first case, the interest rate on the RBC claim was reduced and the period of repayment was extended from

---

[11]The Amended Plan does not address whether or not there would be a holdback or administrative cost to NCB should it be allowed to credit bid in the auctions.  In addition, the Amended Plan does not allow for the possibility that the Debtor and NCB may not be able to agree on terms for an auction sale(s).

2001 to 2007. *Id.* In the subsequent case, the plan provided that payments to RBC be extended until 2014. *Id.* Mr. Price testified that the property on which RBC had a secured claim was valued at Six Hundred Thousand Dollars ($600,000.00). *Id.* RBC conceded that it was fully secured. *Id.* The proposed plan provided payments to RBC and, if the payments were not made, the real estate would be liquidated. *Id.* Judge Small determined that there was a reasonable prospect that the proposed reorganization would be successful based on the testimony of Mr. Price regarding his income and expenses. *Id.* Furthermore, he found that the plan was feasible given that the primary asset would be liquidated. *Id.*

However, *Price* is distinguishable from this case. In this case, NCB is not an over-secured creditor. In contrast, the liquidation analysis prepared by the Debtor indicates that there is little to no equity in the commercial properties.[12] RBC had an approximate Four Hundred Thousand Dollars ($400,000.00) equity cushion in *Price*. *Id.*

Furthermore, *Price* proposed to continue to operate the business and offered the court specific testimony regarding income and expenses. *Id.* However, the Amended Plan in this case seeks an equity infusion[13] or sale of the property, either privately or through an auction process. The Debtor has made no showing of its viability during the period in which the auction process is to be negotiated and conducted.

---

[12]    The Debtor's schedules value the commercial real estate at approximately One Million, Five Hundred Thousand Twenty Dollars ($1.52 Million) and the secured debt included as of June 30, 2008 was approximately One Million Three Hundred Eighty Thousand Dollars ($1.38 Million). Therefore, based on some of the early pleadings in this case, there may have been a limited amount of equity in the commercial properties.

[13]    The Plan does not address that should the Debtor obtain a capital contribution, whether the Debtor would continue to try to sell the commercial properties or if the Debtor would begin operating the gas stations again once the secured debts were satisfied.

In addition, the debtor in *Price* intended to liquidate its primary asset to pay RBC's claim in full.  *Id.*  The Amended Plan allows the Debtor to maintain the rental properties and continue their operation with no regard as to whether or not NCB's claim on the commercial properties continues to increase.  It appears to the Court that the Debtor is attempting to cherry pick which parts of the business it wants to operate without regard to operating the company as a whole.  Consequently, the Court finds that *Price* is inapplicable in this case.

 The Court finds that the Amended Plan is devoid of information -important information- about the Debtor's proposed investor and information about the proposed liquidation.  Consequently, the Amended Plan is not feasible, even though the Debtor has proposed to liquidate a portion of its real property should its alternative method of reorganization fail.

Accordingly, based on the deficiencies in the Amended Plan, the Court finds that the Amended Plan does not satisfy the requirements of Section 1129 and, therefore, confirmation of the Amended Plan is **DENIED**.

## DISCLOSURE STATEMENT

Bankruptcy courts and creditors rely on a debtor's disclosure statement in determining whether to vote for or approve a proposed plan of reorganization.  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362 (3rd Cir. 1996), *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.),* 216 B.R. 175, 180 (Bankr. E.D.Va. 1997), *aff'd without opinion* 163 F.3d 598 (4th Cir. 1998).  Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.  *See In re Nelson*, 216 B.R. at 180.  As such, the importance of full and honest disclosure is critical and can not be overstated.  *In re Ryan Operations,* 81 F.3d at 362.

Section 1125(a)(1) of the Bankruptcy Code defines adequate information as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor; any successor to the debtor; and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information...

In determining the adequacy of information under Section 1125(a)(1), the bankruptcy court reviews the information on a case by case basis. *In re A.H. Robins, Co.,* 880 F.2d 694 (4th Cir. 1989). Adequate information was vaguely defined by Congress so that courts could view the circumstances of each particular case. *In re Oxford Homes, Inc.,* 204 B.R. 264, 269 (Bankr. Me. 1997) (internal citations omitted). In the end though, a proper disclosure statement should be clear and succinct. *In re Joseph A. Ferretti,* 128 B.R. 16, 19 (Bankr. N.H. 1991).

Beyond a liquidation analysis, the Disclosure Statement, failed to provide any additional information that a hypothetical investor would need in order to make an informed judgment about the Amended Plan. There is no way for a hypothetical investor to determine the value of the property beyond the Debtor's best guess. The only values provided by the Debtor are the liquidation analysis values, which are significantly lower than the amounts shown on the Debtor's schedules. The Debtor failed to provide any appraisals for either the commercial or the residential properties.

The Second Disclosure Statement failed to provide any discussion of the Debtor's plan to market and sell the commercial properties beyond listing them with the agent; any comparable

sales studies or market analysis within Wilson County during the past year; or any population density studies for the areas surrounding the stores and stations. Of great concern to the Court is the Debtor's failure to address the impact of the commercial lease rejection.

In addition, although the Debtor filed its monthly operating reports, it failed to provide any revenue projections for the residential properties or any prior performance history for either the commercial stores or the residential property. The Debtor has even failed to provide a list of occupancy rates and again, the Debtor has failed to address the impact, if any, the rejection of the residential leases will have on the Debtor's ongoing business.[14] Without this information, the Court is left questioning whether a hypothetical investor could reasonably be expected to evaluate the Second Disclosure Statement.

Mr. Denton stated that he thought there may be an investor interested in the commercial properties. Even though remote, if the principal of the Debtor believes that the possibility exists, the creditors are entitled to know the specifics regarding the status of the negotiations, the amounts being considered, and the likelihood that the transaction will come to fruition prior to voting on a plan. Though some of this information was provided at the hearing, creditors are entitled to the information before they cast their ballots, not after.

When providing creditors with information in connection with a disclosure statement, more is better. A disclosure statement should provide the average unsecured creditor "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *Id*. at 19. Neither the Disclosure Statement nor the Amended Plan provide any specifics as to the anticipated costs of the auction(s) which would impact whether or not equity

---

[14]The Court questions if the residential tenants received notice of the bankruptcy filing. The mailing matrix does not appear to provide notice to the tenants.

may exist for distribution to unsecured creditors.  The Debtor requests a ten percent (10%) holdback for administrative costs and expenses yet fails to substantiate the basis of the holdback amount.  The Debtor failed to provide whether there may be any lease termination damages for the termination of the commercial tenant's lease upon confirmation or whether there would be any conditions or costs related to the Debtor's termination of the real estate agent's listing agreement.  Based on the Amended Plan and Second Disclosure Statement, an unsecured creditor is not even able to project an estimate of the cost of the sale of the commercial properties. Such information is necessary for creditors to make an informed judgment regarding the Amended Plan.

Accordingly, the Court finds that the Second Disclosure Statement does not contain adequate information and approval of the Second Disclosure Statement is **DENIED**.

**SO ORDERED.**

**END OF DOCUMENT**